**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTONIO MCDOWELL,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | No. **04 CV 04992** |
| | ) | |
| **ANTHONY RAMOS,** | ) | **The Honorable Joan B. Gottschall** |
| | ) | |
| **Respondent.** | ) | |
| | ) | |
| | ) | |

**AMENDED PETITION FOR WRIT OF *HABEAS CORPUS***

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

I.    <u>PARTIES</u> ....................................................................................................... 4

II.    <u>JURISDICTION AND VENUE</u> ................................................................. 4

III.    <u>BACKGROUND</u> .......................................................................................... 5

      A.    PROCEDURAL BACKGROUND...................................................5

      B.    FACTUAL BACKGROUND..........................................................6

            1.    Pre-Trial Proceedings................................................... 6

            2.    Mr. McDowell's Trial.................................................. 8

            3.    Judgment of Conviction and Sentencing. .................................. 12

            4.    Mr. McDowell's Appeals............................................ 13

            5.    Mr. McDowell's Counsel's Investigation Into Detective Guevara's Unconstitutional Practices. ......................................... 14

IV.    <u>GROUNDS UPON WHICH PETITIONER IS BEING HELD UNLAWFULLY</u>....................................................................... 24

<u>COUNT I</u> ..............................................................................................................25

      A.    MR. MCDOWELL'S INEFFECTIVE ASSISTANCE CLAIM REQUIRES THE AUTOMATIC REVERSAL OF HIS CONVICTIONS. ..................................................................25

            1.    Mr. McDowell's Ineffective Assistance Claim Should Be Reviewed on the Merits. ............................................................. 25

            2.    Mr. McDowell Was Denied His Sixth Amendment Right to The Effective Assistance of Counsel. ............................................. 26

            3.    Trial Counsel's Deficient Performance Prejudiced Mr. McDowell's Case, and Mr. McDowell's Convictions Should Be Reversed........................... 31

<u>COUNT II</u> ...........................................................................................................33

      A.    MR. MCDOWELL'S DUE PROCESS CLAIM REQUIRES THE AUTOMATIC REVERSAL OF HIS CONVICTIONS. ......................................33

1.  This Court May Review Mr. McDowell's Due Process Claim On Its Merits. ................................................................................................... 34

2.  The State Erred In Admitting and Allowing Witness Identification Evidence When The Evidence Was the Result of Unduly Suggestive Procedures. ................................................................................................ 35

3.  Admission of The Tainted Witness Identification Prejudiced Mr. McDowell's Case, and Mr. McDowell's Convictions Should Be Reversed. ................................................................................................................. 36

PRAYER FOR RELIEF ................................................................................................ 37

# **TABLE OF AUTHORITIES**

**Page(s)**

**C**ASES

*Bivens v. Briley*,
No. 00 C 7327, 2004 WL 1718437 (N.D. Ill. July 29, 2004) ...........................................25, 26

*Chambers v. Armontrout*,
907 F.2d 825 (8th Cir. 1990), *cert denied*, 498 U.S. 950 (1990)............................................28

*Cooper v. Woodford*,
358 F.3d 1117 (9th Cir. 2004) .................................................................................................26

*Cossel v. Miller*,
229 F.3d 649 (7th Cir. 2000) ........................................................................................4, 32, 33

*Earls v. McCaughtry*,
379 F.3d, 489, 495-96 (7th Cir. 2004) .....................................................................................32

*Gaines v. Thieret*,
665 F. Supp. 1342 (N.D. Ill. 1987) ....................................................................................29, 30

*Hampton v. Leibach*,
290 F. Supp. 2d 905 (N.D. Ill. 2001) (Kennelly, J.), *aff'd*, 347 F.3d 219 (7th Cir.
2003) ....................................................................................................................................27, 28

*Hunt v. Jaglowski*,
655 F. Supp. 681 (N.D. Ill. 1987) ............................................................................................15

*Lewis v. Sternes*,
390 F.3d 1019 (7th Cir. 2004) ..................................................................................................31

*Majoy v. Roe*,
296 F.3d 770 (9th Cir. 2002) ..............................................................................................25, 26

*McMann v. Richardson*,
397 U.S. 759 (1970)..................................................................................................................27

*Montgomery v. Petersen*,
846 F.2d 407 (7th Cir. 1988) ..............................................................................................28, 32

*Murray v. Carrier*,
477 U.S. 478 (1986)...................................................................................................................32

*Porter v. McCollum,*
    558 U.S. _____, 2009 WL 4110975 (2009) ............................................................2

*Raygoza v. Hulick,*
    474 F.3d 958 (7th Cir. 2007) ...............................................................27, 32

*Rodriguez v. Scillia,*
    193 F.3d 913 (7th Cir. 1999) ...............................................................31

*Schlup v. Delo,*
    513 U.S. 298 (1995)............................................................................25, 26

*Strickland v. Washington,*
    466 U.S. 668 (1984)..............................................................4, 27, 28, 31

*Sullivan v. Fairman,*
    819 F.2d 1382 (7th Cir. 1989) .............................................................28

*United States v. Cronic,*
    466 U.S. 648 (1984)............................................................................32

*United States v. Leibach,*
    347 F.3d 219 (7th Cir. 2003) ...............................................................27, 33

*Wainwright v. Sykes,*
    433 U.S. 72 (1977)..............................................................................25

*Washington v. Smith,*
    219 F.3d ..............................................................................................30

*Watkins v. Miller,*
    92 F. Supp. 2d 824 (S.D. Ind. 2000) ..................................................26

*White v. Godinez,*
    301 F.3d 796 (7th Cir. 2002) ...............................................................28, 29, 32

*Williams v. Washington,*
    59 F.3d 673 (7th Cir. 1995) .................................................................28

**STATUTES**

720 ILCS 5/18-3 (1995)..............................................................................3

720 ILCS 5/8-4(a)(1995) ............................................................................3

720 ILCS 5/9-1 (1995) ...............................................................................3

28 U.S.C. § 1331 .......................................................................................4

28 U.S.C. § 2241 ................................................................................................................4, 5

28 U.S.C. § 2254 ..................................................................................................................4

28 U.S.C. § 2254(d) .............................................................................................................1

**OTHER AUTHORITIES**

Fourteenth Amendment ...........................................................................................2, 4, 13, 24

Sixth Amendment .........................................................................................................2, 24

U.S. Const., Amendment VI ......................................................................................3, 26, 27

Antonio McDowell, by his attorneys, respectfully submits this Amended Petition for Writ of *Habeas Corpus* ("Amended Petition") to remedy constitutional violations that resulted in Mr. McDowell's conviction and the denial of post-conviction relief. Mr. McDowell requests that this Court grant *habeas* relief, pursuant to 28 U.S.C. § 2254(d), in the form of release from his unlawful detention or a new trial. As an interim measure, Mr. McDowell requests that the Court set a schedule for discovery and one or more hearings to address the relief requested herein.

## PRELIMINARY STATEMENT

1.      Through this Amended Petition, Mr. McDowell seeks relief from a 103-year prison sentence that he received when wrongfully convicted of first-degree murder, attempted murder, and aggravated vehicular hijacking. Mr. McDowell has been incarcerated for more than ten years, despite the fact that no physical evidence linked Mr. McDowell to the crime, the lead detective involved abused his position to influence witness identification, and the sole evidence linking Mr. McDowell to the crime was unreliable witness testimony that resulted from those tainted identification procedures.

2.      This case arises out of an incident that occurred on December 21, 1996. In that incident, an individual approached Mr. Mario Castro while Mr. Castro was returning home. In an apparent robbery, the individual shot Mr. Castro. Mr. Castro died from his wounds. Mr. Castro's relatives ran outside and chased the assailant away. The assailant shot at Mr. Castro's relatives in the ensuing chase. A short time later, Ms. Ruth Morales-Santana was driving in the alley behind her home. A man took the car from Ms. Morales-Santana at gunpoint and drove away. Mr. McDowell did not commit those crimes.

3.      Prior to his trial, Mr. McDowell informed his trial counsel (hereinafter, "Trial Counsel") that there were serious flaws in the identification procedure and that Mr. McDowell had an alibi at the time of the crime. Nevertheless, Trial Counsel never investigated Mr.

McDowell's claim, never questioned the witnesses about how they came to identify Mr. McDowell, and presented no evidence beyond the testimony of Mr. McDowell's friend, Kenneth Beecham. Instead, the trial court was left to rely on unchallenged and faulty witness identification to convict Mr. McDowell. That conviction was improper and should be reversed.

4.     The first error that requires *habeas* relief relates to Trial Counsel's ineffectiveness. Trial Counsel did not adequately prepare for and investigate facts supporting Mr. McDowell's defense, as required by the Sixth Amendment. *See Porter v. McCollum*, 558 U.S. ____, 2009 WL 4110975, at *5-6 (2009) (per curiam) (upholding an ineffective assistance of counsel claim for counsel's inadequate investigation during penalty phase of trial). Critically, Trial Counsel did not challenge the identification of Mr. McDowell, which occurred over seven months after the crime and under unduly suggestive circumstances, and did not investigate Mr. McDowell's statements regarding the lead detective, Detective Reynaldo Guevara. If Trial Counsel had conducted even a cursory investigation into Detective Guevara, Trial Counsel would have found that Detective Guevara had an extensive history of witness intimidation, coercion, and abuse, which would have supported Mr. Dowell's defenses.

5.     In addition to the failure to challenge the witnesses' identifications of Mr. McDowell, Trial Counsel failed to adequately investigate or obtain evidence to support Mr. McDowell's alibi, failed to interview the sole witness presented in Mr. McDowell's defense, failed to advise Mr. McDowell on the advantages of testifying and that it was Mr. McDowell's decision whether to testify on his own behalf.

6.     The second error that requires *habeas* relief relates to the admission of witness identification testimony at trial that resulted from an unduly suggestive identification procedure, which violated Mr. McDowell's Fourteenth Amendment rights under the Due Process Clause.

The circumstances of the witnesses' initial identifications of Mr. McDowell were so flawed that any later identifications were unreliable as well. The admission of the identification evidence was prejudicial and improper because no physical evidence linked Mr. McDowell to the crime.

7.     To find Mr. McDowell guilty of murder, the trier of fact was required to find that Mr. McDowell intentionally killed Mr. Castro, knew that there was a strong probability that actions would kill Mr. Castro, or killed Mr. Castro in the commission of a forcible felony. *See* 720 ILCS 5/9-1 (1995). To find Mr. McDowell guilty of attempted murder, the trier of fact was required to find that Mr. McDowell intended to kill Mr. Castro's nephew, Mr. Varela. *See* 720 ILCS 5/8-4(a)(1995); 720 ILCS 5/9-1 (1995). To find Mr. McDowell guilty of vehicular hijacking, the trier of fact was required to find that Mr. McDowell took Ms. Morales-Santana's car by force. 720 ILCS 5/18-3 (1995). With constitutionally adequate counsel, no reasonable trier of fact could have convicted Mr. McDowell. The following successful defense would have been presented: the detectives on the case, in particular Detective Guevara, improperly showed witnesses a photograph of Mr. McDowell in retaliation for Mr. McDowell's refusal to identify a man in an unrelated incident, which led to the false identification of Mr. McDowell as the perpetrator of the crime.

8.     The remainder of this Amended Petition is organized as follows. Section I of this Amended Petition introduces the parties. Section II establishes jurisdiction and proper venue. Section III sets forth the relevant procedural and factual background.

9.     In Section IV.A, Mr. McDowell establishes that he is entitled to *habeas* relief on the ground that he was not afforded the effective assistance of counsel guaranteed by the Sixth Amendment, and, but for trial counsel's errors, it is reasonably probable that the outcome of his trial would have been different. The failure to investigate Mr. McDowell's claims and introduce

evidence at trial of the improper identification procedures rendered Mr. McDowell's trial unfair. Mr. McDowell's trial counsel committed multiple errors that cannot be seen as the result of "strategic choices" under applicable constitutional standards. The cumulative errors "so undermined the proper functioning of the adversarial process that [Mr. McDowell's] trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

10. In Section IV.B, Mr. McDowell demonstrates that he is entitled to *habeas* relief on the independent ground that he was denied his constitutional right to Due Process under the Fourteenth Amendment by the admission of witness identification testimony that was the result of an improperly suggestive identification procedure. *See Cossel v. Miller*, 229 F.3d 649, 655-56 (7th Cir. 2000).

## I. PARTIES

11. On March 26, 1999, Antonio McDowell was convicted of first-degree murder, attempted murder, and aggravated vehicular hijacking in the Circuit Court of Cook Count. Mr. McDowell was imprisoned in the Menard Correctional Center in Menard, Illinois until August 2008. At the time, Mr. McDowell was transferred to the Stateville Correctional Center in Joliet, Illinois, where he remains today. Mr. McDowell's prisoner identification number is K-73352.

12. Anthony Ramos is Acting Warden at the Stateville Correctional Center.

## II. JURISDICTION AND VENUE

13. The United States District Court has jurisdiction over Mr. McDowell's claims pursuant to 28 U.S.C. § 1331 because they arise under the laws of the United States, specifically 28 U.S.C. §§ 2241 and 2254.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 2241(d) because Mr. McDowell was convicted in a state court within this District of the crimes for which he is presently unlawfully detained.

15. This *habeas corpus* proceeding – including this Amended Petition – is Mr. McDowell's first such proceeding in federal court. There are no other legal proceedings pending in any court with respect to Mr. McDowell's conviction or sentence.

## III.  **BACKGROUND**

### A.  **PROCEDURAL BACKGROUND**

16. On March 26, 1999, Mr. McDowell was convicted, and sentenced to consecutive terms of 59-years for first-degree murder, 29-years for attempted murder, and 15-years for vehicular hijacking in the Circuit Court of Cook County. Mr. McDowell's total sentence is 103 years.

17. Mr. McDowell appealed his conviction and sentence to the Appellate Court of Illinois, First District. Mr. McDowell's appeal raised one ground for relief, that the trial court abused its discretion in sentencing 103 years of imprisonment based on Mr. McDowell's lack of remorse. (Dkt. 24, 121.) On January 22, 2002, the Appellate Court of Illinois affirmed the conviction. (Dkt. 23, 71.)

18. Mr. McDowell filed a petition for leave to appeal to the Supreme Court of Illinois on the same grounds. The Supreme Court denied the petition on May 30, 2002. (Dkt. 13, Ex. D.)

19. On April 24, 2002, Mr. McDowell filed a *pro se* post-conviction petition in the Circuit Court of Cook County (Dkt., 13, Ex. E.) The Circuit Court of Cook County denied Mr. McDowell's petition on June 6, 2002. (Dkt. 25, 3.)

5

20.     On January 31, 2003, Mr. McDowell appealed the denial of the post-conviction petition (Dkt. 13, Ex. G.). The Appellate Court of Illinois denied Mr. McDowell's petition on September 5, 2002. (*Id.*, Ex. J.)

21.     On November 13, 2003, Mr. McDowell filed for leave to appeal to the Supreme Court of Illinois raising the same four grounds as in the Appellate Court. (*Id.*, Ex. K.). The Illinois Supreme Court denied leave to appeal on January 28, 2004. (*Id.*, Ex. L.)

22.     On July 25, 2004, Mr. McDowell filed a *pro se* petition for writ of *habeas corpus* in this Court. (Dkt. 1.) On July 17, 2009, this Court appointed Jerold S. Solovy of Jenner & Block LLP to represent Mr. McDowell. (Dkt. 37.)

## B.     FACTUAL BACKGROUND

### 1.     Pre-Trial Proceedings.

#### (1)     Mr. McDowell's Interaction with the Police.

23.     On July 10, 1997, Mr. McDowell was shot in the hand on the 4800 Block of West Van Buren Street at approximately 1:30 A.M. (Ex. 1 at ¶ 1.) Mr. McDowell was taken to Laretia Hospital, where Mr. McDowell was treated for a bullet wound to his left hand. Before leaving the hospital, Mr. McDowell spoke with police officers who questioned him regarding the shooting. (*Id.*)

24.     On July 14, 1997, detectives visited Mr. McDowell's mother's home. They informed her that Mr. McDowell should go to the police station for an interview. (*Id.* at ¶ 2.)

25.     On July 23, 1997, Mr. McDowell was questioned by several detectives and taken to the police station. (*Id.* at ¶ 3.) Mr. McDowell was told to go through a gang profile book to identify the person who shot him. (*Id.*) At the police station Detective Guevara told Mr. McDowell to identify a particular person, whom Mr. McDowell had never seen before, as the person who shot him. (*Id.*)

6

26. When Mr. McDowell refused to cooperate, Detective Guevara sat Mr. McDowell on a bench and handcuffed Mr. McDowell to a wall for approximately two hours. (*Id*.) Detective Guevara repeatedly asked Mr. McDowell to identify the particular individual as the shooter. (*Id*.) Mr. McDowell refused to falsely accuse that individual. (*Id*.) Detective Guevara offered to allow Mr. McDowell to leave the police station if Mr. McDowell would identify the man as the individual who shot him. (*Id*.) Later, Detective Guevara told Mr. McDowell that if Mr. McDowell participated in a line up, Mr. McDowell would be allowed to leave. (*Id*.) Mr. McDowell agreed to participate in the line up.

27. After the line up, Detective Guevara told Mr. McDowell that a witness to a murder had identified Mr. McDowell as the murderer. (*Id*.) Detective Richard Maher then handcuffed Mr. McDowell to the wall. (*Id*.) Detective Maher showed Mr. McDowell a picture of Mr. McDowell. (*Id*.) Detective Maher stated that Detective Guevara used the photograph to implicate Mr. McDowell with the witnesses. (*Id*.) Later, Detective Guevara stated that all Mr. McDowell had to do was "come to the station when they first came to [Mr. McDowell's] house" and identify the person Detective Guevara believed shot Mr. McDowell. (*Id*.) Mr. McDowell was indicted by a grand jury and taken into custody to await trial.

     (2)  The Inadequate Investigation and Preparation of Mr. McDowell's Defense.

28. Mr. McDowell met with Trial Counsel once, one week before trial. (Ex. 2 at ¶ 4.) Mr. McDowell had no other contact with Trial Counsel. (*Id*. at ¶ 7.) Mr. McDowell advised Trial Counsel of the fact that Mr. McDowell had no involvement with the crime. (*Id*. at ¶ 5.) Mr. McDowell told Trial Counsel that detectives involved in the case conducted the witness interviews improperly. (*Id*.) Mr. McDowell informed Trial Counsel that Detective Guevara had shown a picture of Mr. McDowell to witnesses in order to frame Mr. McDowell for the crime.

(*Id*.)  Trial Counsel did not investigate Detective Guevara's history in relation to Mr. McDowell's statements.  (*Id*. at ¶ 9).  In addition, Mr. McDowell presented Trial Counsel with the name of Kenneth Beecham, who could support Mr. McDowell's alibi.  (*Id*. at ¶ 6.)  Nonetheless, Trial Counsel did not interview Mr. Beecham.  (Ex. 3 at ¶ 2.) Trial Counsel spoke to Mr. Beecham for the first time on the day of the trial.  (*Id*. at ¶ 3.)

29.    The next time Mr. McDowell met with Trial Counsel was March 23, 1999, the first day of trial.  (*See* Ex. 2 at ¶ 7.)  Mr. McDowell was prepared for a jury trial, but Trial Counsel told him that having a bench trial would remove the possibility of the death penalty. (*Id*.) On advice of counsel, Mr. McDowell waived a trial by jury.  (*See* Dkt. 26, 9 ln. 1-9.) However, the State informed the trial court that the State still would seek the death penalty.  (*Id*. at 11, ln. 7-8.)  Trial Counsel did not discuss trial strategy with Mr. McDowell and did not discuss with him the possible benefits and risks of testifying on his own behalf.  (Ex. 2 at ¶ 7.) Mr. McDowell did not testify and did not present his defense.

### 2.    Mr. McDowell's Trial.

30.    The trial was continued to March 24, 1999 because the State had not expected the waiver of a jury trial and was not prepared with witnesses.  (Dkt. 26, 10 ln. 8-10.)  Before beginning to hear evidence, the trial court asked Mr. McDowell if he wished to have a jury proceeding for the sentencing phase, should Mr. McDowell be found guilty.  (*Id*. at 16, ln. 24 - 17, ln. 6.)  Trial Counsel stated that Mr. McDowell wished to proceed with a bench sentencing hearing, if found guilty of murder.  (*Id*. at 17, ln. 10-17.)

31.    The State called seven witnesses: Martha Castro, wife of Mr. Castro; Juan Medina, brother-in-law to Mr. Castro; Alberto Varela, nephew of Mr. Castro; Ruth Morales-Santana whose car was stolen; Officer Marczuk; Officer Stocker; Detective Guevara; and Detective Gilger.  Detective Guevara, Juan Medina, Alberto Varela, and Ruth Morales-Santana

testified about the identification procedures.  The other witnesses testified about other aspects of the crime, and did not identify or refer directly to Mr. McDowell.

(1)    <u>Detective Guevara's Testimony</u>

32.    Detective Guevara, formerly of the Area 5 Violent Crimes section of the Chicago Police Department, testified that he was assigned to investigate the incident of December 21, 1996.  (Dkt. 22 at 66, ln. 20-22.)

33.    Detective Guevara testified that on July 12, 1997, he visited Juan Medina to show Mr. Medina a photograph array.  (*Id*. at 68, ln. 17-20.)  Detective Guevera stated that Mr. Medina identified one individual from the array but requested a more recent photograph.  (*Id*. at 69, ln. 14 - 70, ln. 12.)  Detective Guevara testified that he returned to Mr. Medina with computer generated photographs on July 21, 1997, and that Mr. Medina identified Mr. McDowell's photograph.  (*Id*. at 72, ln. 22 - 74, ln. 12.)  Detective Guevara then testified that he showed the same photographs to Ms. Morales-Santana and Alberto Varela, who also identified Mr. McDowell's photograph.  (*Id*. at 74, ln. 22 - 77, ln. 14.)

34.    Detective Guevara testified that he then conducted a line up on July 23, 1997, at approximately 9:00 p.m., where Mr. Varela and Mr. Medina separately identified Mr. McDowell.  (*Id*. at 77, ln. 20 - 80, ln. 9.)  Detective Guevara also testified that he conducted a second line up at 11:15 p.m., in which Ms. Morales-Santana identified Mr. McDowell.  (*Id*. at 80, ln. 14 - 82, ln. 2.)  Trial Counsel did not cross examine Detective Guevara with respect to any aspect of his improper conduct toward Mr. McDowell.

(2)    <u>Juan Medina's Trial Testimony.</u>

35.    Mr. Medina's testimony was critical to the State's case because he was one of the only three witnesses who testified about the witness identification procedure.

9

36.     Mr. Medina testified that on December 21, 1996 he was at home, next door to Mr. Castro.  (Dkt. 26 at 56, ln. 17 - 57, ln. 9.)  He stated that at approximately 3:00 PM he heard a gun shot and looked out his rear window.  (*Id*. at 57, ln. 7 - 58, ln. 21.)  Mr. Medina testified that he saw a black man with a gun searching Mr. Castro.  (*Id*. at 58, ln. 22-23.)  Mr. Medina testified that he opened a window and yelled at the man standing over Mr. Castro.  (*Id*. at 61, ln. 11-16.)  He testified that the man standing over Mr. Castro looked up and Mr. Medina identified Mr. McDowell, in court, as the man who was standing over Mr. Castro.  (*Id*. at 61, ln. 17 - 62, ln. 7.)

37.     Mr. Medina testified that, on July 12, 1997, Detective Guevara brought a book of photographs.  (*Id*. at 63, ln. 8-14.)  Mr. Medina testified that he identified a picture of Mr. McDowell but asked for a more recent photograph.  (*Id*. at 64, 4-24.)  Mr. Medina further testified that Detective Guevara returned with computer photographs and Mr. Medina identified Mr. McDowell.  (*Id*. at 65, ln. 14 - 66, ln. 21.)  Mr. Medina also testified that he attended a lineup on July 23, 1997, at which time he identified Mr. McDowell.  (*Id*. at 67, ln. 9 - 68, ln. 19.)  Trial Counsel did not cross examine Mr. Medina based on the information that Mr. McDowell had provided.

### (3)     Alberto Varela's Trial Testimony.

38.     Mr. Varela testified that on December 21, 1996 he was at Mr. Castro's house at 1410 North Harding Street (*Id*. at 113, ln. 6-10.)  Mr. Varela testified that at about 3:00 he was standing on the second floor of the home.  He testified that he heard a woman scream.  (*Id.* at 114, ln. 9-24.)  Mr. Varela testified that he looked out the window and saw a man searching Mr. Castro.  (*Id.* at 116, ln. 13-23.)  Mr. Varela identified Mr. McDowell as the man that he saw standing over Mr. Castro.  (*Id.* at 116, ln. 23 - 117, ln. 4.)  Mr. Varela testified that he ran outside and confronted the man standing over Mr. Castro.  (*Id.* at 118, ln. 10-11.)  Mr. Varela testified

that he then hit the man searching Mr. Castro.  (*Id.* at 119, ln. 10-13.)  Mr. Varela testified that

the man then ran away and fired the gun back towards Mr. Varela.  (*Id.* at 120, ln. 12-16.)

39.　　　Mr. Varela testified that on July 22, 1997, the police spoke to him regarding the

incident.  (*Id.* at 127, ln. 18 - 117, ln. 1.)  Mr. Varela testified that the police showed him pictures

on that date.  (*Id.*)  He testified that he recognized one of the individuals in the series of five

pictures, and that individual was Mr. McDowell.  (*Id.* at 128, ln. 17-20.)  Mr. Varela testified that

on July 23, 1997 he went to the police station to view a line up.  (*Id.* at 132, ln. 14 - 133, ln. 10.)

He testified that at the line up he identified Mr. McDowell as the man who shot Mr. Castro.  (*Id.*

at 134, ln. 4-19.)  Trial Counsel did not cross examine Mr. Varela based on the information that

Mr. McDowell had provided.

(4)　　Ruth Morales-Santana's Trial Testimony.

40.　　　Ms. Morales-Santana testified that on December 21, 1996 she was in the alley

on the 1500 block of North Karlov.  (Dkt. 22 at 12, ln. 16 - 13, ln. 9.)  She testified that a man

approached her in the alley.  (*Id.* at 14, ln. 4-8.)  She identified Mr. McDowell as that individual.

(*Id.* 14, ln. 21 - 15, ln. 5.)  Ms. Morales-Santana testified that the man asked for her car keys as

she exited her car.  (*Id.* at 17, ln. 1-16.)  She testified that the man had a gun in his hand while he

asked for her keys.  (*Id.* at 19, ln. 8-11.)

41.　　　Ms. Morales-Santana testified that on July 21, 1997, Detective Guevara came to

her home.  (*Id.* at 33, ln. 13-15.)  She testified that he showed her black and white photographs.

(*Id.* at 33, ln. 19-21.)  She stated that she identified Mr. McDowell from the photographs that

Detective Guevara showed her.  (*Id.* at 34, ln. 2 - 35, ln. 9.)  Ms. Morales-Santana testified that

on July 23, 1997, Detective Guevara called her to Area 5 Violent Crimes Police Headquarters.

(*Id.* at 35, ln. 15-19.)  Ms. Morales-Santana testified that she was asked to view a physical line

up at Area 5.  (*Id.* at 36, ln. 1-3.)  She testified that she asked that everyone in the line up put on a

baseball cap before she identified Mr. McDowell as the man who stole her car.  (*Id.* at 36, ln. 12 - 36, ln. 9.)  She testified that Detective Guevara was the only individual with her in the line up witness room.  (*Id.* at 38, ln. 22 - 39, ln. 9.)  Trial Counsel did not cross examine Ms. Morales-Santana based on Mr. McDowell's allegations.

(5)     <u>Lack of Direct Evidence.</u>

42.   The State presented no physical evidence at trial connecting Mr. McDowell to the crime.

43.   No witnesses testified to having seen Mr. Castro being shot.

(6)     <u>Closing Arguments.</u>

44.   In closing, the prosecution argued that Mr. McDowell engaged "in a killing spree."  (Dkt. 22 at 135, ln. 2-3.)  The prosecution focused its argument on the identifications of Mr. McDowell by Mr. Medina, Mr. Varela, and Ms. Morales-Santana.  (*See id*. at 140-141.)

45.   In closing, Trial Counsel argued that the witness testimony was inconsistent and that the physical evidence did not support the witness testimony.  (*Id*. at 147, ln. 3 - 153, ln. 4.)

46.   In rebuttal, the prosecution highlighted the witness identification by three witnesses and the general consistency of the witness testimony.  (*Id*. at 154, ln. 4-14; *id*. at 155, ln. 9-17.)

**3.     Judgment of Conviction and Sentencing.**

47.   On March 26, 1999, the trial court found Mr. McDowell guilty of first degree murder, attempted first degree murder, aggravated discharge of a firearm, aggravated vehicular hijacking, and armed robbery.  (*See* Dkt. 22, 174 ln. 2 - 176 ln. 4.)

48.   On April 26, 1999, the trial court heard arguments on sentencing.  The court sentenced Mr. McDowell to consecutive terms of 59 years for first-degree murder, 29 years for attempted murder, and 15 years for vehicular hijacking.  (*Id*. at 219, ln. 9-23.)

12

### 4. Mr. McDowell's Appeals

49. Mr. McDowell appealed his conviction and sentence to the Appellate Court of Illinois, First District. Mr. McDowell's appeal raised one ground for relief, that the trial court abused its discretion in sentencing 103 years of imprisonment based on Mr. McDowell's lack of remorse. (Dkt. 24, 121.) On January 22, 2002, the Appellate Court of Illinois affirmed the conviction. (Dkt. 23, 71.)

50. Mr. McDowell filed a petition for leave to appeal to the Supreme Court of Illinois on the same grounds. The Supreme Court denied the petition on May 30, 2002. (Dkt. 13, Ex. D.)

51. On April 24, 2002, Mr. McDowell filed a *pro se* post-conviction petition in the Circuit Court of Cook County raising five separate grounds for relief:

    a. ineffective assistance of appellate counsel for failure to challenge the sufficiency of the evidence used to convict him;

    b. violation of his due process and equal protection rights because the indictment was obtained using perjured and false testimony;

    c. violation of his Fourth and Fourteenth Amendment rights because the police arrested him without probable cause;

    d. the State failed to introduce sufficient evidence; and

    e. he was denied a fair and impartial trial due to the trial judge's bias and improper statements at trial.

(Dkt., 13, Ex. E.) The Circuit Court of Cook County denied Mr. McDowell's petition on June 6, 2002. (Dkt. 25, 3.)

52. On January 31, 2003, Mr. McDowell, appealed the denial of the post-conviction petition raising three grounds:

    a. violation of his Fourth and Fourteenth Amendment rights because his arrest was made without probably cause due to: (1) the photo

shown to witnesses being unduly suggestive; and (2) no physical evidence supporting his arrest;

b.  ineffective assistance of counsel for failing to challenge the sufficiency of the evidence;

c.  lack of impartiality by the judge.

(Dkt. 13, Ex. G).

53.  The Appellate Court of Illinois denied Mr. McDowell's petition on September 5, 2002.  (*Id.*, Ex. J.)

54.  On November 13, 2003, Mr. McDowell filed for leave to appeal to the Supreme Court of Illinois raising the same four grounds as in the Appellate Court.  (*Id.*, Ex. K.).  The Illinois Supreme Court denied leave to appeal on January 28, 2004.  (*Id.*, Ex. L.)

55.  On July 25, 2004, Mr. McDowell filed a *pro se* petition for writ of *habeas corpus* in this Court.  (Dkt. 1.)  On July 17, 2009, this Court appointed Jerold S. Solovy of Jenner & Block LLP to represent Mr. McDowell.  (Dkt. 37.)

## 5.  Mr. McDowell's Counsel's Investigation Into Detective Guevara's Unconstitutional Practices.

56.  If Trial Counsel had investigated Detective Guevara's history based on the information that Mr. McDowell provided regarding the detective's improper conduct in this case, that investigation would have uncovered the long history of abusive practices of which Detective Guevara has been accused in public filings and sworn testimony.

57.  At least 30 people have testified in court, depositions, or by affidavit to have been intimidated or beaten by Detective Guevara over a span of 19 years in order to obtain false identifications or unconstitutional confessions.  The intimidation and unconstitutional acts are summarized as follows:

14

58.     In a sworn affidavit, a letter to the Office and Professional Standards, and testimony in *Hunt v. Jaglowski*, Leshurn Hunt stated that in 1983, Detective Guevara and other officers forcibly removed Mr. Hunt from his home and handcuffed him to a ring in the wall at the police station where Mr. Hunt was beaten about the head, face, and body until he confessed to murder and robbery charges.  Mr. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until he confessed.  Mr. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards.  Witnesses who saw Mr. Hunt while in custody corroborated his claim of being beaten by the police.  The criminal court judge suppressed Mr. Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.[1]  (*See* Ex. 4.)

59.     In a sworn affidavit, Reynaldo Munoz stated that in 1985, Detective Guevara attempted to coerce a false statement from Mr. Munoz.  Mr. Munoz stated that Detective Guevara handcuffed Mr. Munoz and put him in the back of a squad car.  When Mr. Munoz denied knowing the people Detective Guevara was asking about, Detective Guevara repeatedly hit Mr. Munoz in the mouth with his fist.  Mr. Munoz stated that Detective Guevara then took Mr. Munoz to rival gang territory where Detective Guevara allowed rival gang members to spit on Mr. Munoz and beat Mr. Munoz about the head.  (*See* Ex. 5.)

60.     In *People v. Perez*, Daniel Pena testified that in 1986, Detective Guevara and two other officers coerced a confession from Mr. Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation.  Mr. Pena testified that he was taken to see a doctor where he complained about being beaten by the

---

[1]   In his civil rights action against a number of named Area 5 police officers, including Detective Guevara, Hunt alleged a "pervasive pattern" among Detective Guevara and other Area 5 officers of excessive use of force during arrest and interrogation.  The federal district court ruled that this claim was sufficient to survive the defendant's motion to dismiss.  *See Hunt v. Jaglowski,* 655 F. Supp. 681, 685 (N.D. Ill. 1987).

police. The parties in *People v. Perez* stipulated that the doctor who treated Mr. Pena would testify that he found bruising to Mr. Pena's legs and abrasions and lacerations to Mr. Pena's nose. Family members corroborated Mr. Pena's claim that Mr. Pena had been beaten while in police custody. (*See* Ex. 6.)

61. Victor Vera stated in a sworn affidavit that in 1989, Detective Guevara coerced a false confession from Mr. Vera by transporting Mr. Vera to rival gang territory and threatening to release Mr. Vera unless Mr. Vera confessed to the murder of Edwin Castaneda. Mr. Vera stated that he feared for his life, and confessed to a crime he knew nothing about. (*See* Ex. 7.)

62. Virgilio Calderon Muniz stated in a sworn affidavit and testified in *People v. Vera* that in 1989, Detective Guevara coerced Mr. Muniz into making a false identification by threatening that if Mr. Muniz did not identify Victor Vera as the murderer, Mr. Muniz would have "trouble" the next time Detective Guevara saw Mr. Muniz. (*See* Ex. 8.)

63. In *People v. Johnson*, Samuel Perez testified that in 1989, Detective Guevara coerced Mr. Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Mr. Perez testified that Detective Guevara put Mr. Perez inside Detective Guevara's car, showed Mr. Perez a photo of Juan Johnson, and told Mr. Perez that Detective Guevara wanted Juan Johnson to take the blame for the murder. Mr. Perez testified that because Detective Guevara had a reputation in the neighborhood for "hooking people up," Mr. Perez understood Detective Guevara's statement as a threat that if Mr. Perez did not identify Mr. Johnson, Mr. Perez would be framed for the murder. (*See* Ex. 9.)

64. Virgilio Muniz stated in a sworn affidavit, that in 1989, Detective Guevara coerced Mr. Muniz into making a false identification by repeatedly threatening Mr. Muniz that if

Mr. Muniz did not identify Manuel Rivera as the murderer, Mr. Muniz would "go down for the murder." (*See* Ex. 10.)

65. In *People v. Arcos*, Wilfredo Rosario testified that in 1991, Detective Guevara coerced Mr. Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Mr. Rosario that if Mr. Rosario did not identify Xavier Arcos as the murderer, Mr. Rosario would be "pinned" for the murder. Mr. Rosario stated that Detective Guevara fed Mr. Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Mr. Rosario recanted his identification of Mr. Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence. (*See* Ex. 11.)

66. David Rivera stated in a sworn affidavit that in 1991, Detective Guevara coerced Mr. Rivera into signing a confession for murder by intimidation, threats, and inducements. Mr. Rivera stated that Detective Guevara told him that if Mr. Rivera confessed he would serve 7 years in prison whereas if Mr. Rivera did not confess he would be sent away for 50 years. Detective Guevara then promised Mr. Rivera that if Mr. Rivera signed a statement, he could go home. (*See* Ex. 12.)

67. In *People v. Rodriguez*, David Velazquez testified that in 1991, Detective Guevara physically coerced Mr. Velazquez into making a false identification and giving false testimony by beating Mr. Velazquez while chained to a wall at Area 5 and threatening to "get you for anything I can" if Mr. Velazquez did not talk. Mr. Velazquez stated that all of the details of his statement were provided by Detective Guevara. (*See* Ex. 13.)

68. In a sworn affidavit, Daniel Rodriguez stated that in 1991, Detective Guevara coerced a false confession through the use of threats and intimidation. Mr. Rodriguez stated that

while en route to the police station, Detective Guevara threatened to harm Mr. Rodriguez's family if he did not cooperate. Mr. Rodriguez stated that at Area 5, Mr. Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Detective Guevara's partner Detective Ernest Halvorsen in the chest and torso. Mr. Rodriguez also stated that Detective Guevara provided details of the crime to Mr. Rodriguez to include in Mr. Rodriguez's false confession. (*See* Ex. 14.)

69. In a sworn affidavit, Carl Richmond stated that in 1993, Detective Guevara coerced a false identification by threatening Mr. Richmond that Detective Guevara could make Mr. Richmond's life very uncomfortable if Mr. Richmond did not identify Robert Bouto as the murderer of one of Mr. Richmond's friends. Mr. Richmond stated that he was familiar with Detective Guevara's tactics, and believed that Detective Guevara would honor that threat. (*See* Ex. 15.)

70. In a sworn affidavit, Armando Serrano testified that in 1993, Detective Guevara hit Mr. Serrano in the face with an open hand while Mr. Serrano was shackled to a police-station wall in an attempt to get Mr. Serrano to confess to murder. (*See* Ex. 16.)

71. In a sworn affidavit, Francisco Vicente stated that in 1993, Detective Guevara used physical violence and inducements to coerce Mr. Vicente into giving false testimony at the joint trial of Armando Serrano, Jorge Pacheco, and Jose Montanez. Mr. Vicente stated that when he refused to cooperate, Detective Guevara hit Mr. Vicente in the head and then promised Mr. Vicente money and a favorable disposition on unrelated pending charges. (*See* Ex. 17.)

72. In a sworn affidavit, Adolfo Frias-Munoz stated that in 1993, Detective Guevara used physical force and threats to coerce a false confession. Mr. Frias-Munoz stated that over the course of a two-day interrogation, he was handcuffed to a ring on the wall of the

interrogation room, hit in the face with an open hand by Detective Guevara, and beaten by two other officers. Mr. Frias-Munoz stated that even though he was isolated in a locked interrogation room, he could hear his wife screaming and his son crying in another room. Mr. Frias-Munoz stated that Detective Guevara threatened that if Mr. Frias-Munoz did not confess, Mr. Frias-Munoz's wife would go to prison and his children would be taken away. Mr. Frias-Munoz stated that he agreed to give a statement to an assistant state's attorney. Mr. Frias-Munoz stated that he spoke in Spanish and Detective Guevara translated the statement so that the prosecutor could write the statement in English. Mr. Frias-Munoz stated he then signed a statement that he could not read. (*See* Ex. 18.)

73. In a hearing in *People v. Cruzado*, Elizer Cruzado testified that in 1993, Detective Guevara arrested Mr. Cruzado, who was fifteen at the time, and threatened Mr. Cruzado with life imprisonment if Mr. Cruzado did not implicate himself in a murder. Mr. Cruzado also testified that Detective Guevara stated that Mr. Cruzado could go home and see his family again, but only if Mr. Cruzado agreed to make a statement. At the time, Mr. Cruzado had a limited ability to read and write. (*See* Ex. 19.)

74. In a sworn affidavit, Adrian Duta stated that Detective Guevara coerced a confession after 14 hours of interrogation. Mr. Duta stated Detective Guevara hit Mr. Duta in the face with an open palm, punched Mr. Duta in the stomach, and told Mr. Duta he could go home if he signed a statement. In a sworn affidavit, Mr. Duta's father stated that Mr. Duta was exhausted and crying, and Mr. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Mr. Duta complained to his father of being struck in the head and stomach by Detective Guevara. (*See* Ex. 20.)

75. In a post-conviction hearing in *People v. Almodovar*, Kennelly Saez testified that in 1994, Detective Guevara showed Kennelly Saez photos of Roberto Almodovar and William Negron and told Mr. Saez that they were the shooters, in advance of a live line up. Mr. Saez also testified that Detective Guevara told Mr. Saez not to mention the fact that Detective Guevara had shown the photos to Mr. Saez in advance of the line up. Mr. Saez subsequently identified Mr. Almodovar and Mr. Negron in the live line up and testified against them at trial. Mr. Saez later recanted his identification testimony. (*See* Ex. 21.)

76. In a sworn affidavit, Melinda Power, an attorney, stated that she interviewed Jackie Grande for her client. Ms. Grande told Ms. Power that in 1994, Detective Guevara showed Ms. Grande photos of Roberto Almodovar and William Negron in advance of a live line up. Ms. Grande told Ms. Power that Detective Guevara stated that the men in the photographs were the shooters. Ms. Grande identified Mr. Almodovar and Mr. Negron in the live line up and testified against them at trial. (*See* Ex. 22.)

77. In *People v. Diaz*, Luis Figueroa testified that in 1995, Detective Guevara told Mr. Figueroa to falsely identify Angel Diaz as the perpetrator of a crime even though Mr. Figueroa did not see anything. Mr. Figueroa identified Mr. Diaz but recanted his identification at trial. (*See* Ex. 23.)

78. In *People v. Sierra*, Jose Melendez testified that in 1995, Detective Guevara told Jose Melendez to falsely identify Thomas Sierra as the killer even though Mr. Melendez did not see the shooter. Mr. Melendez identified Mr. Sierra, but recanted the identification at trial. (*See* Ex. 24.)

79. In a deposition, Edwin Davila testified that in 1995, Detective Guevara arrested Mr. Davila and, in an attempt to coerce a confession, chained Mr. Davila to the wall of an

interrogation room.  Mr. Davila testified that Detective Guevara stated that Detective Guevara was going to frame Mr. Davila for murder regardless of Mr. Davila's innocence.  Mr. Davila stated that after Mr. Davila told Detective Guevara that he did not do it, Detective Guevara forced Mr. Davila to participate in a line up in which two witnesses identified Mr. Davila as the perpetrator.  (*See* Ex. 25.)

80.     In a sworn affidavit, Santos Flores stated that in 1995, Detective Guevara and his partner Detective Ernest Halvorsen coerced a confession from Mr. Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney.  During the course of an 11-hour interrogation, Detective Guevara yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day.  Mr. Flores eventually gave a statement to the police indicating his involvement in the crime.  Mr. Flores's statement was ruled inadmissible on appeal on the grounds that the statement was elicited in violation of *Miranda.*  (*See* Ex. 26.)

81.     In a deposition, Gloria Ortiz Bordoy testified that in 1995, Detective Guevara coerced Ms. Bordoy into making a false statement and testifying falsely against Santos Flores at trial.  Ms. Bordoy stated that during her six-to-eight-hour interrogation, Detective Guevara yelled in her face, threatened that her children would be taken by DCFS, called her "the B word," and "raised his hand" saying that he "felt like smacking" her.  She stated that finally, without reading its contents, Ms. Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."  (*See* Ex. 27.)

82.     In a sworn affidavit Rodolfo Zaragoza testified that in 1995, Detective Guevara coerced Mr. Zaragoza, who was a victim and an eyewitness to the crime, into making a false identification and providing false testimony.  Mr. Zaragosa stated that he was intimidated by

Detective Guevara and felt pressured to identify Ricardo Rodriguez because Detective Guevara told Mr. Zaragosa that Mr. Rodriguez was the shooter. (*See* Ex. 28.)

83.     In a deposition, Maria Rivera testified that in 1996, Detective Guevara coerced her into making a false identification by making threatening gestures at her, unzipping his pants, and propositioning her. Ms. Rivera later told the prosecutor, in the presence of her attorney, that she had falsely identified an individual in a line up at Detective Guevara's direction. The prosecution later abandoned murder charges against the individual whom Ms. Rivera falsely identified in the lineup. (*See* Ex. 29.)

84.     In an affidavit, Jed Stone, an attorney who represented Voytek Dembski, stated that in 1997, Detective Guevara coerced a false confession from Mr. Dembski by beating him while chained to a wall in a locked interrogation room. Mr. Stone stated that Mr. Dembski, a Polish national who did not speak English, was interrogated by Detective Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Mr. Stone stated that Mr. Dembski could not read the statement he eventually signed as it was written in English. (*See* Ex. 30.)

85.     In *People v. Santiago*, Robert Ruiz testified that in 1997, Detective Guevara coerced Mr. Ruiz into making a false identification. Mr. Ruiz testified that Detective Guevara detained Mr. Ruiz repeatedly over the course of a ten-day period, locking Mr. Ruiz in an interrogation room without food, water, or a bathroom. Mr. Ruiz stated that he kept telling Detective Guevara that he did not see the shooter or the driver. Mr. Ruiz stated that Detective Guevara told Mr. Ruiz whom to identify and what to say in his statement. Mr. Ruiz finally implicated the Santiago brothers in the murder because Mr. Ruiz believed that Detective Guevara would continue to harass him until Mr. Ruiz changed his story. Mr. Ruiz recanted his

identification at trial, and the judge found Freddy and Conception Santiago not guilty. (*See* Ex. 31.)

86. Rosauro Mejia testified that in 1998, Detective Guevara repeatedly hit Mr. Mejia in an attempt to coerce a confession. Mr. Mejia never confessed and was finally released after being held in custody for three days. (*See* Ex. 32.)

87. In *People v. Solache and Reyes*, Arturo Reyes testified that in 1998, Detective Guevara repeatedly threatened and beat Mr. Reyes in an attempt to unconstitutionally coerce Mr. Reyes into giving an incriminating statement. After two days of isolation and interrogation, Mr. Reyes provided a statement. (*See* Ex. 33.)

88. In *People v. Solache and Reyes*, Gabriel Solache testified that in 1998, Detective Guevara repeatedly struck Mr. Solache on the left side of his head and in the stomach while Mr. Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Mr. Solache gave a false statement so the beating would stop. Mr. Solache sought medical treatment for his injuries and sustained permanent hearing loss to his left ear. (*See* Ex. 34.)

89. In 2001, the FBI issued a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Detective Guevara. The report details that Detective Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Detective Guevara also took bribes to alter both positive and negative lineup identifications of murder suspects. Finally, the report states that Detective Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated. (*See* Ex. 35.)

90.     The foregoing incidents constitute evidence that, among other things: (a) Detective Guevara threatened adverse legal consequences when individuals would not make false statements; (b) Detective Guevara fed details of crimes to individuals from whom he attempted to coerce statements; (c) Detective Guevara coerced people into making untrue statements; (d) Detective Guevara lied about his misconduct and engaged in other dishonest and/or illegal behavior.   In short, Trial Counsel would have been able to find substantial evidence to support Mr. McDowell's defenses if Trial Counsel had investigated Mr. McDowell's statements.

## IV.    GROUNDS UPON WHICH PETITIONER IS BEING HELD UNLAWFULLY

91.     Count I establishes that Mr. McDowell's Sixth Amendment right to effective counsel was violated by Trial Counsel's failure to investigate and present Mr. McDowell's defense that Detective Guevara improperly influenced Mr. McDowell's identification, and that the witness testimony identifying Mr. McDowell was invalid.   The failure to present Mr. McDowell's defense was the result of three primary errors.  First, Trial Counsel did not attempt to question the witnesses on the circumstances of their identification of Mr. McDowell, nor did he investigate Mr. McDowell's assertion that a picture was improperly shown to the witnesses before they identified him.  Second, Trial Counsel did not adequately interview and present the sole defense witness or investigate any other witnesses who could support Mr. McDowell's alibi.  Third, Trial Counsel did not advise Mr. McDowell of the risks and benefits of testifying on his own behalf and did not afford him the opportunity to do so.

92.     Count II establishes that Mr. Parker's Fourteenth Amendment right to Due Process was violated by the admission of witness identification testimony that derived from an unduly suggestive identification process.

24

## COUNT I

**A.     MR. MCDOWELL'S INEFFECTIVE ASSISTANCE CLAIM REQUIRES THE AUTOMATIC REVERSAL OF HIS CONVICTIONS.**

**1.     Mr. McDowell's Ineffective Assistance Claim Should Be Reviewed on the Merits.**

93.     Mr. McDowell's ineffective assistance claim should be reviewed on the merits in order to redress a fundamental miscarriage of justice.  Even if a defendant's claim has been procedurally defaulted, a federal court should review the claim in a federal *habeas* proceeding where the petitioner "demonstrates . . . that enforcing the default would result in a 'fundamental miscarriage of justice.'"  *Bivens v. Briley*, No. 00 C 7327, 2004 WL 1718437, at *3 (N.D. Ill. July 29, 2004) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)) (Gottschall, J.).  To demonstrate that a default would result in a fundamental miscarriage of justice, a defendant may prove his "actual innocence."  *Majoy v. Roe*, 296 F.3d 770, 775 (9th Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 316 (1995)).  In this context, the term "actual innocence," means that "a court cannot have confidence in the outcome of the trial."  *Majoy*, 296 F.3d at 776 (citing *Schlup*, 513 U.S. at 316).

94.     In *Schlup*, the Supreme Court set the standard for district courts to determine whether to have confidence in the outcome of a trial:

> <u>First</u>, the district court is not bound by the rules of admissibility that would govern at trial, so the court may consider the probative force of evidence that was excluded or unavailable at trial.  <u>Second</u>, the court must make the determination of innocence in light of all available evidence, including the newly discovered evidence.  The court does not act itself as a hypothetical juror, but must instead "make a probabilistic determination about what reasonable, properly instructed jurors would do."  In making this determination, the court must keep in mind the term "reasonable."  The court must presume that a reasonable juror would consider fairly all the evidence presented and would "conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt."

*Watkins v. Miller*, 92 F. Supp. 2d 824, 839-40 (S.D. Ind. 2000) (citing *Schlup*, 513 U.S. at 327-329) (internal citations omitted).  Under these standards, a court should lose confidence in the outcome of a trial where, through affidavits or other new evidence, the defendant proves that it is more likely than not that a reasonable trier of fact would not have convicted the defendant. *Bivens*, 2004 WL 1718437, at *3-4; *Cooper v. Woodford*, 358 F.3d 1117, 1120-22 (9th Cir. 2004); *Schlup*, 513 U.S. at 316.

95.     Mr. McDowell is innocent of the crimes for which he was convicted.  Failing to consider his claims would result in a fundamental miscarriage of justice.  Additionally, in Mr. McDowell's post-conviction petition, Mr. McDowell asserted that the identification procedures were faulty.  (Dkt. B, Ex. E at 5.)  The Circuit Court of Cook County denied Mr. McDowell's petition without a hearing.  (*Id.*, Ex. F.)

96.     It is more likely than not that a reasonable trier of fact would have acquitted Mr. McDowell if presented with the defense that Detective Guevara tainted the witness identifications of Mr. McDowell.  *Schlup*, 513 U.S. at 316; *Majoy*, 296 F.3d at 777.  As a result, this Court should address the merits of Mr. McDowell's claim.

### 2.     Mr. McDowell Was Denied His Sixth Amendment Right to The Effective Assistance of Counsel.

97.     Mr. McDowell was denied the effective assistance of counsel, as guaranteed by the Sixth Amendment, because Trial Counsel did not investigate and present Mr. McDowell's defense that Detective Guevara's actions tainted the witness identifications.

98.     Specifically, Trial Counsel did not:  (1) attempt to question the witnesses on the circumstances of their identification of Mr. McDowell, nor did he investigate Mr. McDowell's assertion that a picture was improperly shown to the witnesses before they identified him; (2) adequately interview and present the sole defense witness or investigate any other witnesses who

could support Mr. McDowell's alibi; and (3) advise Mr. McDowell of the risks and benefits of testifying on his own behalf and did not afford him the opportunity to do so. Because these errors cannot be the result of any "strategic choice" by Mr. McDowell's counsel, Trial Counsel's deficient performance denied Mr. McDowell his Sixth Amendment rights.

99.     The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel at trial. U.S. Const., Amend. VI; *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The United States Supreme Court has established a two-part test to determine whether counsel's performance fell short of the effective assistance guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. To establish a *Strickland* claim, a petitioner must show: (1) counsel's performance fell below the proper standard for effective assistance; and (2) the errors prejudiced the outcome of the trial. *Id.*

100.     Perhaps the most important duty of counsel under *Strickland* is to conduct a reasonable investigation. *Strickland*, 466 U.S. at 690-91. Counsel has a duty to make reasonable investigations or to reasonably decide that a particular investigation is unnecessary. *Strickland*, 466 U.S. at 691.

101.     It is settled law that an attorney must investigate a case in order to provide minimally competent representation. *United States v. Leibach*, 347 F.3d 219, 247 (7th Cir. 2003). The duty to investigate is particularly critical where the prosecution relies heavily on eyewitness testimony that might be rebutted effectively with the testimony of other eyewitnesses. *Hampton v. Leibach*, 290 F. Supp. 2d 905, 923 (N.D. Ill. 2001) (Kennelly, J.), *aff'd*, 347 F.3d 219, 253 (7th Cir. 2003). Strategic choices made after a less than complete investigation of the law and facts relevant to plausible options for the defense are reasonable only to the extent that reasonable professional judgments support the limitations of investigations. *Raygoza v. Hulick*,

27

474 F.3d 958, 962 (7th Cir. 2007). When counsel fails to investigate at all, his choices cannot be considered acceptable "strategy." *Montgomery v. Petersen*, 846 F.2d 407, 412 (7th Cir. 1988); *Sullivan v. Fairman*, 819 F.2d 1382, 1391-92 (7th Cir. 1989).

102.     Counsel also has the duty to consult with his client because, among other things, the nature and scope of counsel's investigation, preparation, and defense, are developed directly from consultation with the client. *White v. Godinez*, 301 F.3d 796, 800 (7th Cir. 2002). Indeed, counsel's duty to consult with his client is one of the most basic components of adequate representation. *Id.* (citing *Strickland*, 466 U.S. 688.).

103.     Applying those principles, the Seventh Circuit has held that the failure to interview known witnesses is objectively unreasonable. *See Williams v. Washington*, 59 F.3d 673, 681 (7th Cir. 1995). That is because counsel cannot make an informed strategic decision about "trial tactics" until he has interviewed the potential witnesses and knows what they would say. *Hampton*, 290 F. Supp. 2d at 922; *see also Chambers v. Armontrout*, 907 F.2d 825, 830-31 (8th Cir. 1990), *cert denied*, 498 U.S. 950 (1990) ("counsel's decision not to interview and present witnesses that supported defendant's theory of defense [was] deficient performance").

104.     The Seventh Circuit has found that a counsel's performance can be deficient when he does not adequately prepare the defense of his client. In *White v. Godinez*, 301 F.3d 796 (7th Cir. 2002), the Seventh Circuit granted *habeas* relief on a petitioner's claim that an attorney's investigation of a defendant charged with murder and the conspiracy to commit murder was deficient. In preparation for trial, counsel (Green) met with his client (White) twice. *Id.* at 799. During the first meeting, which took place five months before trial and lasted about 10 minutes, Green and White discussed the fee arrangement. *Id.* During the second meeting, which lasted 20 minutes, they discussed jury selection issues, a proposed witness's testimony, and a potential

witness the State might call. *Id.* According to White, he asked Green to explore the possibility of a witness testifying on his behalf, but Green ignored this request. *Id.* Green never discussed trial strategy or any other possible defense witnesses, including White himself, and never asked for information relevant to the defense. *Id.*

105.    The Seventh Circuit held that Green's failure to discuss with White or investigate the alternative defense supported by the proposed witness's testimony "simply cannot be attributed to strategic decision making when [Green] had not explored the facts necessary to make that decision." *Id.* at 802. The State argued that Green instead selected another defense, but the Court "fail[ed] to see how the thoroughness with which Green may or may not have pursued his own theory of the case can compensate for his failure to discuss with White or consider a defense based on White's version of events -- a necessary step before Green could make a reasonable decision about which course to follow." *Id.* Thus, Green's brief consultation with White and the failure to explore the possibility of other witness testimony "fell below the standard of reasonably effective representation." *Id.* at 803.

106.    Here, as in *White*, Trial Counsel did not adequately investigate and present Mr. McDowell's defense because Trial Counsel did not adequately consult with Mr. McDowell or investigate factual support for Mr. McDowell's defense. Mr. McDowell only met with Trial Counsel once, one week before trial. (Ex. 2 at ¶¶ 4, 7.) Mr. McDowell provided Trial Counsel with facts that would have provided a basis for a successful defense. (*Id.* at ¶ 5.) In particular, Mr. McDowell told Trial Counsel that Detective Guevara had used a photograph in an improperly suggestive manner to frame him for the crimes. (*Id.*) In addition, Mr. McDowell presented Trial Counsel with the name of Kenneth Beecham, who could support his alibi. (*Id.* at

¶ 6.)  Trial Counsel did not investigate the photograph or Detective Guevara's actions.  (*Id.* at ¶ 9.)  Trial Counsel did not interview Mr. Beecham before trial.

107.    The second meeting Mr. McDowell had with Trial Counsel was the day of trial.  (*Id.* at ¶ 7.)  Trial Counsel did not explain that Mr. McDowell had the right to testify on his own behalf.  (*Id.* at ¶ 8.)  Trial Counsel never explained the benefits and negatives of testifying on his own behalf.  (*Id.*)  Trial Counsel also advised Mr. McDowell to accept a bench trial, explaining that a bench trial would spare Mr. McDowell from the death penalty.  (*Id.* at ¶ 7.)  Mr. McDowell accepted a bench trial and never testified on his own behalf.  This failure to meaningfully consult with Mr. McDowell and adequately investigate his defense led to three critical errors by Trial Counsel.

108.    Trial Counsel erred in failing to investigate Mr. McDowell's statements that Detective Guevara had framed him for the crime.   If Trial Counsel had conducted an investigation into Mr.  McDowell's statements, Trial Counsel would have found at least eight of the incidents relating to Detective Guevara, listed *supra*, before Mr. McDowell's trial.  (*See e.g.,* Ex. 13.)  For example, Trial Counsel could have found the testimony of Mr. Figueroa stating that Detective Guevara told Mr. Figueroa to identify Mr. Diaz as the perpetrator of a crime, even though Mr. Figueroa did not see the Mr. Diaz at the crime scene.  (*See* Ex. 23.)  This evidence, along with interviewing the witnesses to the crime, could have shown that the witness identification procedure was unduly suggestive and unreliable.   On its own, this omission deprived Mr. McDowell of his constitutional right to adequate representation.  *See Washington v. Smith*, 219 F.3d at 620 (finding that failure to investigate was not objectively reasonable).

109.    In addition, Trial Counsel compounded that error by failing to interview the only defense witness he presented.  Trial Counsel did not speak with Mr. Beecham until the day of

trial. (Ex. 3 at ¶ 3.) That failure to interview Mr. Beecham meant that Mr. Beecham was wholly unprepared with his testimony regarding Mr. McDowell's alibi.

110. Moreover, Trial Counsel refused Mr. McDowell the option of testifying on his own behalf. (Ex. 2 at ¶ 7.) Trial Counsel failed to advise Mr. McDowell of the advantages of testifying or that it was his choice to testify. In sum, Trial Counsel did not provide adequate representation.

111. Trial Counsel's conduct here did not satisfy the *Strickland* requirement that counsel "make reasonable investigations or . . . make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. A reasonable investigation would have been "determined or substantially influenced" by the information Mr. McDowell provided to Trial Counsel. *Id.* In contrast, Trial Counsel ignored Mr. McDowell's story, failed to investigate and present evidence at trial that contradicted the State's version of events, and failed to meaningfully advise Mr. McDowell or allow him the option to testify in his own defense. Thus, Trial Counsel's conduct was ineffective under the first prong of *Strickland*.

### 3. Trial Counsel's Deficient Performance Prejudiced Mr. McDowell's Case, and Mr. McDowell's Convictions Should Be Reversed.

112. The United States Constitution guaranteed Mr. McDowell a zealous advocate who would investigate facts crucial to proving his innocence or to limiting his penalty in the event of his conviction. Trial Counsel's failure to investigate worked to Mr. McDowell's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004) (citation and emphasis omitted); *Rodriguez v. Scillia*, 193 F.3d 913, 917 (7th Cir. 1999). While even a single error by counsel can constitute ineffective assistance of counsel, the numerous errors here clearly were prejudicial.

*See Murray v. Carrier*, 477 U.S. 478, 496 (1986); *United States v. Cronic*, 466 U.S. 648, 658-62 (1984); *Earls v. McCaughtry*, 379 F.3d, 489, 495-96 (7th Cir. 2004).

113.   The test for evaluating prejudice is whether there is a reasonable probability that counsel's errors affected the outcome of the trial. *Montgomery*, 846 F.2d at 414-15.   A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 415.   The defendant need not show that counsel's deficient conduct more than likely altered the outcome of the case. *Raygoza*, 474 F.3d at 963.

114.   In analyzing prejudice from a failure to investigate, the "focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming its admissibility in court, would have produced a different result." *Montgomery*, 846 F.2d at 414-15.   A verdict supported by weak evidence is more likely to have been affected by errors than one with overwhelming record support. *Malone*, 538 F.3d at 759.

115.   In *Cossel*, the Seventh Circuit found that the performance of petitioner's trial counsel was not reasonable, when trial counsel failed to move to suppress witness identification testimony based on unduly suggestive procedures. *Cossel*, 229 F.3d at 654.   In Mr. McDowell's case, Trial Counsel did not even perform an investigation of the identification procedures.   While Trial Counsel filed a motion to suppress certain identification testimony, the motion was based on the version of events from the police reports, and not on an investigation into Mr. McDowell's claims. *See* (Dkt. 24 at 64-65.)

116.   Finally, if Trial Counsel had provided meaningful advice to Mr. McDowell regarding the advantages of testifying and that it was Mr. McDowell's decision to testify, Mr. McDowell would have taken the stand and presented his defense. *White,* 301 F.3d at 803.   If he had taken the stand, Mr. McDowell would have testified that the detectives involved in his case

told him that they were improperly prejudicing the witnesses and showed him proof in the form of the photograph Detective Guevara used with the witnesses. (Ex. 1 at ¶ 3.)

117. The prejudice to Mr. McDowell's case is clear because the prosecution's case relied on weak evidence. *See Leibach*, 347 F.3d at 249-50. In *Leibach*, the court in evaluating a claim of ineffective assistance of counsel, found relevant the fact that no physical evidence tied the *habeas* petitioner to the crime, and that the prosecution solely relied on eyewitness testimony. *See id*. As in *Leibach*, no physical evidence tied Mr. McDowell to the crime. The prosecution solely relied on eyewitness testimony.

118. Mr. McDowell had a credible defense that was not presented because of Trial Counsel's ineffectiveness: seven months after the crime, Detective Guevara influenced witnesses into believing Mr. McDowell was the man involved, because Mr. McDowell would not falsely identify a man for an unrelated crime. In light of a verdict supported principally by the witness's tainted identification, but for Trial Counsel's deficient investigation, there is a reasonable probability that the result of the proceeding would have been different. *See Cossel*, 229 F.3d at 655-56. Because Mr. McDowell's trial was unfair, his conviction should be reversed.

## COUNT II

### A.    MR. MCDOWELL'S DUE PROCESS CLAIM REQUIRES THE AUTOMATIC REVERSAL OF HIS CONVICTIONS.

119. Mr. McDowell's conviction resulted from a violation of his due process rights. <u>First</u>, the trial court erred in admitting the identification evidence that was the result of impermissibly suggestive pre-trial identification procedures. <u>Second</u>, the due process errors resulted in a fundamentally unfair trial for Mr. McDowell. Accordingly, this Court should reverse Mr. McDowell's convictions.

### 1. This Court May Review Mr. McDowell's Due Process Claim On Its Merits.

120.    A court may review a *habeas* petition if the petitioner (1) exhausted all remedies available in state courts; and (2) fairly presented the federal claim at issue in state court first. *Verdin v. O'Leary*, 972 F.2d 1467, 1474-1475 (7th Cir. 1992); *see also* 28 U.S.C. § 2254(a).

121.    A claim is fairly presented when the petitioner has "offered the operative facts and the controlling legal principles of his claim to the state courts." *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006).  A petitioner may "reformulate somewhat" his state claims, *Griffith v. Hulick*, 587 F. Supp. 2d 899, 908 (N.D. Ill. 2008) (Bucklo, J.) (citing *Verdin*, 972 F.2d at 1474), and is not required to cite the Constitution "book and verse" to preserve his federal claim. *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001).  The *habeas* rules regarding fair presentment stem from the principle of comity, and aim to balance the "junction where federal habeas power intersects with state criminal processes". *Verdin*, 972 F.2d at 1473.

122.    The Seventh Circuit identifies four factors for a District Court to consider in analyzing a fair presentment issue: (1) whether the petitioner relied on relevant federal law that used federal constitutional analysis; (2) whether the petitioner relied on state cases that applied federal constitutional analysis; (3) whether the petitioner asserted the claim in terms so particular "as to call to mind a specific constitutional right;" or (4) whether the petitioner alleged a "pattern of facts that is well within the mainstream of constitutional litigation." *Lieberman v. Thomas*, 505 F.3d 665, 670 (7th Cir. 2007); *Rittenhouse v. Battles*, 263 F.3d 689, 696 (7th Cir. 2001).

123.    In *Rittenhouse*, the Seventh Circuit applied those four factors and held that a Fourteenth Amendment due process challenge to jury instructions was fairly presented where the petitioner only satisfied the third and fourth factors. *Id.*  The Seventh Circuit found that the first two factors were not satisfied because petitioner's briefs did not refer to a single federal or state

34

case addressing federal due process and presented his jury instruction argument in the context of an ineffective assistance claim. *Id.* Nevertheless, the court held that the due process claim was fairly presented because the petitioner's appellate brief, "did in fact present . . . a very substantial analysis of alleged problems with the jury instructions," his argument "clearly implicate[d] the Due Process clause," he made one reference to due process in the last sentence of a ten-page argument, and the state court's analysis squarely addressed and rejected an argument that was "essentially a due process argument." *Id.*

124.    Mr. McDowell consistently argued that the unduly suggestive photograph violated his Fourth and Fourteenth Amendment rights in his post-conviction petition, appeal, and petition for leave to appeal to the Supreme Court of Illinois. (*See* Dkt. 13, Ex. E at 7; *id.*, Ex. G at 14; *id.*, Ex. L at 14.)

125.    Most fundamentally, Mr. McDowell is innocent of the crimes he was convicted of, and failing to consider his claim would result in a miscarriage of justice.

> ### 2.    The State Erred In Admitting and Allowing Witness Identification Evidence When The Evidence Was the Result of Unduly Suggestive Procedures.

126.    The Due Process Clause of the Fourteenth Amendment protects defendants from being identified prior to trial in a way that is "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967).

127.    In-court identifications that follow from unduly suggestive pre-trial identifications are admissible only if the in-court identifications were reliable under the "totality of the circumstances." *U.S. v. Duprey*, 895 F.2d 303, 307 (7th Cir. 1989). In looking at the totality of the circumstances, courts look to the "Biggers factors": (1) the witnesses' opportunity to view the accused at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witnesses' pre-identification descriptions to the accused, (4) the level of certainty demonstrated

by the witness at the time of identification, and (5) the length of time between the crime and the identification. *U.S. v. Newman*, 144 F.3d 531, 536 (7th Cir. 1998). On information and belief, Detective Guevara's statements to the witnesses prior to the in-court identification so tainted the witnesses' identification, that the later identifications are irrepably tainted. *See Cossel*, 229 F.3d at 656.

128.    Detective Guevara showed a picture of Mr. McDowell to the witnesses before any other identification procedures. The showing of a single picture to the witnesses was improperly suggestive, irrespective of any other coercive techniques Detective Guevara employed. *See Simmons v. U.S.*, 390 U.S. 377 (1968). Moreover, as Detective Guevara's history shows, he employed a pattern and practice of coercive and abusive techniques to obtain witness identification testimony. Additionally, Detective Guevara's history of threatening retribution if witnesses do not comply with his requests supports Mr. McDowell's statement that Detective Guevara framed him because Mr. McDowell refused to identify a man in another crime.

**3.    Admission of The Tainted Witness Identification Prejudiced Mr. McDowell's Case, and Mr. McDowell's Convictions Should Be Reversed.**

129.    The witness testimony identifying Mr. McDowell so infected the trial with unfairness as to make the resulting conviction a constitutional violation. *See Cossel*, 229 F.3d at 656. The only evidence presented at trial connecting Mr. McDowell at the crime was the tainted witness identification testimony. Because the State's case relied upon the tainted witness identification, Mr. McDowell's admission of the unreliable identification testimony prejudiced Mr. McDowell's case. Accordingly, Mr. McDowell's convictions should be automatically reversed.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner Antonio McDowell respectfully requests that the Court:

i. issue a writ of *habeas corpus* that Mr. McDowell be released from his unconstitutional confinement and relieved of his unconstitutional conviction; or

ii. in the alternative, grant Mr. McDowell a new trial; and

iii. as an interim measure, conduct hearings at which proof of the allegations presented herein may be presented to this Court and at which Mr. McDowell may argue he is entitled to the relief requested in this Amended Petition; or

iv. grant Mr. McDowell discovery and permit him to amend this Petition including by adding any and all claims that have not yet been raised but will be supported by the discovery Mr. McDowell may request; and

v. grant such other relief as the Court deems appropriate and just.

Dated: December 3, 2009

Respectfully submitted,

ANTONIO MCDOWELL

By: <u>Timothy J. Chorvat</u>
One of his attorneys

Jerold S. Solovy
(jsolovy@jenner.com)
Timothy J. Chorvat
(tchorvat@jenner.com)
William M. Chang
(wchang@jenner.com)
JENNER & BLOCK LLP
353 N. Clark Ave.
Chicago, Illinois 60654
Tel: (312) 923-2651
Fax: (312) 840-7651