UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ) <br> ) <br> ANTONIO MCDOWELL ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> MARCUS HARDY, Warden ) <br> ) <br> Respondent. ) | Case No. 04 CV 04992 <br><br> Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

Petitioner Antonio McDowell was convicted of murder, attempted murder, and aggravated vehicular hijacking. (Tr. R. Vol. 1 at D173-76, Resp. Ex. 1.) This matter comes before the court on McDowell's Second Amended Petition for Writ of Habeas Corpus. (Doc. No. 60.)

### I. BACKGROUND

McDowell was convicted of first degree murder, attempted murder, and aggravated vehicular hijacking after a bench trial in the Circuit Court of Cook County.[1] (Tr. R. Vol. 1 at D173-76.) According to the testimony at trial, McDowell shot and killed Mario Castro on December 21, 1996; while attempting to escape from the scene of the crime, McDowell shot at Alberto Varela and hijacked Ruth Morales-Santana's car. (*See* Tr. Trans. Vol. 1; Tr. Trans. Vol. 2, Resp. Ex. 2.)

---

[1] McDowell is currently incarcerated at the Stateville Correctional Center in Joliet, Illinois, where he is in the custody of Warden Marcus Hardy, the nominal defendant in this case. (Answer to Second Amend. Pet. at 1, Doc. No. 61.; Second Amend. Pet. at 5.)

McDowell's convictions were affirmed by the Illinois Appellate Court, and his petition to the Supreme Court of Illinois was denied. (Order of Ill. App. Ct., Resp. Ex. B; Order of Ill. Sup. Ct., Resp. Ex. C.) McDowell subsequently filed a petition for post-conviction relief, which the Circuit Court rejected. (Pet. for Post-Conviction Relief, Resp. Ex. E; Order of Ill. Cir. Ct. at A-3, Resp. Ex. G.) The Illinois Appellate Court upheld the Circuit Court's decision, and the Illinois Supreme Court denied McDowell's petition for leave to appeal. (Order of Ill. App. Ct., Resp. Ex. J; Order of Ill. Sup. Ct., Resp. Ex. K.)

Having exhausted his state court remedies, McDowell has filed a petition for writ of habeas corpus.[2] (Second Amend. Pet.) Count I of McDowell's habeas petition alleges ineffective assistance of counsel under the Sixth Amendment. (*Id*. at 2, 25-32.) Specifically, McDowell contends that his trial counsel did not:

(1) attempt to question the witnesses on the circumstances of their identification of McDowell, nor did he investigate Mr. McDowell's assertion that a picture was improperly shown to the witnesses before they identified him;

(2) adequately interview and present the sole defense witness or investigate any other witnesses who could support Mr. McDowell's alibi; [or]

(3) advise Mr. McDowell of the risks and benefits of testifying on his own behalf and did not afford him the opportunity to do so.

(*Id*. at 26-27.) In Count II of the petition, McDowell claims that his right to due process was violated by "the admission of witness identification testimony at trial that resulted from an unduly suggestive identification procedure." (*Id*. at 2, 33-36.)

---

[2] McDowell originally filed his habeas petition *pro se*. (Pet., Doc. No. 1.) The court later appointed counsel, who filed an amended petition and a second amended petition on McDowell's behalf. (Amend. Pet., Doc. No. 50; Second Amend. Pet.)

## II. ANALYSIS

**A.  Procedural Default**

Respondent argues that "Petitioner's ineffective assistance . . . and suggestive identification claims are procedurally defaulted" because McDowell failed to raise them on direct appeal or in his post-conviction proceedings. (Answer. to Second Amend. Pet. at 18-28.)  McDowell urges the court to find that the ineffective assistance and "suggestive identification claims" were included in his post-conviction petition, and are therefore not procedurally defaulted.[3]  (Reply at 5-6, Doc. No. 66.)  The court agrees with McDowell.

The court "cannot review a habeas petitioner's constitutional issue unless he has provided the state courts with an opportunity to resolve it 'by invoking one complete round of the state's established appellate review process,'" *Byers v. Basinger*, --- F.3d ---, 2010 WL 2696522, at *4 (7th Cir. 2010) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)), "either on direct appeal or post-conviction review," *Gonzales v. Mize*, 565 F.3d 373, 380 (7th Cir. 2009).  "If the claim comes from the Illinois state courts, the petitioner must have presented each claim in the habeas petition to the Illinois Appellate Court and to the Illinois Supreme Court in a petition for discretionary review."  *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010).

In order to have "fairly presented" an issue, "[t]he petitioner must have placed both the operative facts and the controlling legal principles before the state courts." *Sturgeon v. Chandler*, 552 F.3d 604, 610 (7th Cir. 2009) (quoting *Chambers v. McCaughtry*, 264 F.3d 732, 738 (7th Cir. 2001)).  "A mere passing reference to a

---

[3]  McDowell does not dispute that his other ineffective assistance claims, those based on counsel's alleged failure to prepare alibi witnesses or advise McDowell as to his right to testify, are procedurally defaulted.  (*See* Second Amend. Pet.; Reply.)

3

constitutional issue certainly does not suffice." *Id*. (quoting *Chambers*, 264 F.3d at 738). Rather, "[t]he argument must be placed in the petitioner's brief to the court; the 'requirement is not met if a judge must go outside the four corners of the document in order to understand the contention's nature and basis.'" *Id*. (quoting *Lockheart v. Hulick*, 443 F.3d 927, 929 (7th Cir. 2006)). That said, "a 'hypertechnical congruence' of the claims is not required between federal and state court for a claim to be fairly presented," *Crockett v. Hulick*, 542 F.3d 1183, 1192-93 (7th Cir. 2008) (quoting *Anderson v. Benik*, 471 F.3d 811, 814-15 (7th Cir. 2006)), nor is a habeas petitioner required to cite "'book and verse' of the Constitution," *Lieberman v. Thomas*, 505 F.3d 665, 670 (7th Cir. 2007) (quoting *Picard v. Connor*, 404 U.S. 270, 278 (1971)). Instead, the court must assess "whether the petitioner alerted the state court to the federal nature of his claim in a manner sufficient to allow that court to address the issue on a federal basis." *Lieberman*, 505 F.3d at 670. In evaluating whether a petitioner has "fairly presented" his or her claim, courts consider:

> 1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation.

*Byers*, --- F.3d ----, 2010 WL 2696522, at *4.

**1. Ineffective Assistance**

McDowell met the requirements necessary to avoid procedural default by setting forth the "operative facts and . . . controlling legal principles" of an ineffective assistance claim in his post-conviction briefing. *See Sturgeon*, 552 F.3d at 610. McDowell set forth the "controlling legal principle" by directly invoking his Sixth Amendment right to

effective counsel. In his briefs to the Illinois Appellate and Supreme Courts, McDowell argued that "the trial [court] erred in summarily denying Antonio McDowell's petition which alleged that he was denied his Sixth Amendment right to effective assistance of both trial and appellate counsel." (Opening Br. and Argument for Def.-Appellant at 1, Resp. Ex. G; Pet. for Leave to Appeal at 2, 16, Resp. Ex. K.) McDowell set forth the "operative facts" of his claim by asserting that "a reasonable doubt argument should have been raised on petitioner's behalf . . . [because] the pre-trial identifications were unduly suggestive." (Opening Br. and Argument for Def.-Appellant at 6.) Specifically, McDowell explained that:

> Joseph Medina [one of the witnesses who testified against McDowell] was shown two different groups of photographs prior to identifying Mr. McDowell. What is not explored is whether Antonio McDowell was the only person common to both groups of photographs.

(Reply Br. and Argument for Pet.-Appellant at 5, Resp. Ex. I.) Though this may not be the most clearly-worded argument, McDowell obviously means to suggest that the practice of showing a witness multiple photo arrays containing a common suspect is unduly suggestive.[4] (*See id.*) Nor can there be any doubt that McDowell sufficiently "alerted the state court to the federal nature of his claim," since the Illinois Appellate Court expressly rejected McDowell's ineffective assistance claim. *See Lieberman*, 505 F.3d at 670. (Order of Ill. App. Ct. at 8.) In denying McDowell's petition for post-conviction relief, the Illinois Appellate Court held that:

> Allegations of ineffective assistance of trial and appellate counsel are intertwined with the argument that defendant's arrest was unlawful. . . . Petitioner's allegation that the photographic identifications were suggestive was not supported by the record.

---

[4] At this stage of the proceedings, the court declines to consider whether the identification procedure described by McDowell in his post-conviction briefing was unduly suggestive.

5

(Order of Ill. App. Ct. at 8.) McDowell's claim that trial counsel provided ineffective assistance by failing to challenge the unduly suggestive identification procedures was therefore "fairly presented" to the Illinois Appellate and Supreme Courts.[5]

## 2. Due Process

McDowell also "fairly presented" his due process claim to the Illinois courts during the post-conviction proceedings. *Rittenhouse v. Battles*, 263 F.3d 689, 696 (7th Cir. 2001), is instructive.[6] In *Rittenhouse*, the petitioner sought habeas relief on the grounds that the trial court's jury instructions violated his due process rights. *Id.* But Rittenhouse's post-conviction briefs to the Illinois state courts discussed the jury instructions only "in the context of his argument that he was denied the effective assistance of trial counsel for his attorney's failure to object to those instructions." *Id.*

---

[5] It is unclear from the face of the habeas petition precisely what factual basis McDowell intends to rely on for his Sixth Amendment / suggestive identification claim. (*See* Second Amend. Pet.) Instead of describing the specific circumstances of the identification, McDowell states only that "Detective Guevara had used the photograph [of McDowell] in an improperly suggestive manner." (*See, e.g., id.* at 29.) To the extent McDowell intends to base his Sixth Amendment claim on the events described in his post-conviction briefing—specifically, Joseph Medina having been shown McDowell's picture in two separate photo arrays—it is not procedurally defaulted. (*Compare* Reply Br. and Argument for Pet.-Appellant at 5 *with* Second Amend. Pet. at 29.) Elsewhere in the petition, however, McDowell claims that "Detective Guevara showed a picture of Mr. McDowell to the witnesses before any other identification procedures. The showing of a single photograph to the witnesses was improperly suggestive . . . ." (Second Amend Pet. at 36.) McDowell has failed to cite, and the court has been unable to locate, any reference to "[t]he showing of a single photograph to the witnesses" in McDowell's post-conviction briefs. (*See id.*; Opening Br. and Argument for Def.-Appellant; Reply Br. and Argument for Pet.-Appellant.) Indeed, this appears to be the first time McDowell has made this claim. Thus, to the extent McDowell intends to base his Sixth Amendment claim on the "showing of a single photograph to the witnesses," that claim is barred by procedural default. *See Pole v. Randolph*, 570 F.3d 922, 935 (7th Cir. 2009) ("[I]f a petitioner fails to assert in the state courts a particular factual basis for the claim of ineffective assistance, that particular factual basis may be considered defaulted."). In the forthcoming briefing on the merits, McDowell is instructed to describe the basis for his (non-defaulted) Sixth Amendment / suggestive identification claim in sufficient detail for the court to meaningfully evaluate it.

[6] *See also Reeves v. Winters*, No. 03 C 1431, 2003 WL 21730122, at *3 (N.D. Ill. July 25, 2003) (holding that petitioner fairly presented due process claim relating to improper jury instructions by challenging same instructions on analogous Fourth Amendment grounds).

The district court held that Rittenhouse procedurally defaulted on his due process claim, but the Seventh Circuit disagreed:

> A close review reveals . . . that although Rittenhouse's only discussion of the jury instructions was within the context of his ineffective assistance of counsel claim, he did in fact present the Illinois Appellate Court with a very substantial analysis of the alleged problems with the jury instructions. Additionally, his argument that the instructions created a mandatory presumption . . . clearly implicates the Due Process clause . . . . Likewise, although the appellate court did not say this outright, its analysis concluding that the instructions did not create an improper presumption squarely addresses and rejects Rittenhouse's argument that is essentially a due process argument.

*Id.*

Like the petitioner in *Rittenhouse*, McDowell discussed the unduly suggestive identification procedure "in the context" of an ineffective assistance claim in Illinois state court. *See id*. (*See* Opening Br. and Argument for Def.-Appellant at 16; Reply Br. and Argument for Pet.-Appellant at 5.) As set forth in section II.A.1. of this order, McDowell provided the Illinois courts with a "substantial analysis" of the allegedly suggestive identification procedures, complaining that Medina had been shown the same picture of McDowell in multiple photo arrays. (*See* Opening Br. and Argument for Def.-Appellant at 16; Reply Br. and Argument for Pet.-Appellant at 5.) This "clearly implicate[d] the Due Process clause," since McDowell's trial counsel would presumably have challenged the suggestive identification procedures on Fourteenth Amendment grounds. (*See* Opening Br. and Argument for Def.-Appellant at 16; Reply Br. and Argument for Pet.-Appellant at 5.) As in *Rittenhouse*, the Illinois Appellate Court "squarely addresse[d] and reject[ed]" McDowell's unduly suggestive identification claim, holding that "Petitioner's allegation that the photographic identifications were suggestive was not supported by the

7

record." (Order of Ill. App. Ct. at 8.) Thus, McDowell's due process claim was not procedurally defaulted and can be considered on its merits.[7]

B.   **Actual Innocence**

McDowell argues that his procedurally defaulted claims should nonetheless be considered by the court on the basis of his "actual innocence." (Second Amend. Pet. at 26.) In support of his claim of innocence, McDowell has submitted an affidavit in which he claims to have been "framed" by Chicago Police Detective Renaldo Guevara for refusing to falsely implicate a suspect in an unrelated case. (*Id*. (citing McDowell Aff., McDowell Ex. 1).) McDowell also includes a number of third-party affidavits, trial transcripts, and other documents from various unrelated cases showing that "Detective Guevara employed a disturbing pattern of abuse and coercive techniques in order to obtain false confessions and witness identification." (Reply at 7 (citing McDowell Exs. 4-35).)

Respondent argues that McDowell's evidence falls short of the standard required to prove actual innocence. (Answer to Second Amend. Compl. at 28-29.) Addressing McDowell's claim of having been framed by Guevara, Respondent argues that "no other evidence, other than [McDowell's] own say-so, supports this contention, and the credibility of the story is diluted by the chronology of events leading up to his arrest." (*Id*. at 29.) With respect to McDowell's various other exhibits, Respondent argues that "all this evidence proves is that other people in different cases have accused Detective

---

[7]   Like his Sixth Amendment claim, McDowell's due process claim is only available to the extent it is based on Medina's having been shown pictures of McDowell in two separate photo arrays, as detailed in McDowell's post-conviction briefing. (*See* Reply Br. and Argument for Pet.-Appellant at 5.) To the extent McDowell's habeas claim is based on the "showing of a single photograph to the witnesses," the claim is barred. *See Chambers*, 264 F.3d 738-39 (holding that due process challenge based on retroactive effect of law on jury instructions was procedurally defaulted where post-conviction due process challenge was based on jury instructions' failure to require proof on every element).

8

Guevara of misconduct; it does not prove, as it must . . . , that petitioner is actually innocent of the offenses of which he was convicted." (*Id*. at 29.) The court agrees with Respondent.

A procedurally defaulted habeas claim "is reviewable only where a refusal to consider it would result in a fundamental miscarriage of justice." *Dellinger v. Bowen*, 301 F.3d 758, 767 (7th Cir. 2002) (quoting *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 551 (7th Cir. 2001)). "The fundamental miscarriage of justice exception requires 'the habeas petitioner to show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Smith*, 598 F.3d at 387-88 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). This is a "high bar" for the petitioner to meet. *Id*. "[A] defendant who asserts actual innocence as a reason to excuse a procedural default must do more than invoke those words[;] he 'must demonstrate [his] innocence.'" *Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009) (quoting *Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003)). "To support a colorable claim of actual innocence the petitioner must come forward with 'new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial.'" *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003) (quoting *Schulp*, 513 U.S. at 324).

1. **McDowell's Affidavit**

McDowell claims that "Detective Guevara influenced witnesses into believing Mr. McDowell was the man involved, because Mr. McDowell would not falsely identify

a man for an unrelated crime." (Second Amend. Pet. at 33.) The details of McDowell's affidavit are as follows.

On July 10, 1997, McDowell became the victim of a drive-by shooting. (McDowell Aff. ¶ 1.) Police asked McDowell if he had any idea who shot him; McDowell told them that he did not. (*Id.* ¶ 2.) After being released from the hospital, McDowell learned that police had "returned to my neighborhood with a photo of me wearing a black coat and green shirt showing it to everyone who might know me . . . ." (*Id.*) On July 23, 1997, police approached McDowell and a group of his friends, asking if any of them knew "Antonio Spragg," one of McDowell's aliases. (*Id.*; *see* Tr. R. Vol. 2 at D95.) McDowell avers that "[a]fter I told the detectives who I am they asked me to ride with them to the Station, so I could look through their gang profile book to try and identify the person who shot me on July 10, 1997." (McDowell Aff. ¶ 3.) Back at the station, McDowell went through the gang profile book, and "told Detective Guevara, that I did not see the guy that shot me." (*Id.*) Next, McDowell claims that:

> Det. Guevara, tried to convince me to identify a guy, I have never seen before as the guy who shot me. When I refused to cooperate with Det. Guevara, he became angry with me. I was kind of scared, because of his reputation . . . .

(*Id*. ¶¶ 3, 3A.)) Guevara then allegedly handcuffed McDowell to a bench for two hours, during which "Guevara and the other officers disregarded my pleas of being in pain." (*Id.* ¶ 3A.) According to McDowell:

> Det. Guevara, kept asking me if I was ready to identify the person who shot me. I kept telling Det. Guevara, that I didn't see the person who shot me . . . . Det. Guevara, kept on telling me that when I tell him who shot me, I could leave the Station and go home.

(*Id*. ¶ 3C.) At some point, Guevara told McDowell that a car had arrived to take him home, but first Guevara wanted McDowell to "participate in a Line-Up, because he was a head short." (*Id*.) "After the line-up, I was told by Det. Guevara, that I had been identified by someone who indicated me in a murder;" McDowell was then arrested and taken into custody. (*Id*. ¶ 3E.) McDowell claims that another officer, Detective Maher, "stated to me that the witnesses used the photo [of McDowell in the black coat and green shirt] to identify me in a photo and line-up array." (*Id*.) Detective Maher allegedly went on to say that "he had nothing to do with the photo identification, that it was Det. Guevara's doing;" Detective Maher then told McDowell, "you didn't hear that from me." (*Id.* ¶ 3F.) According to McDowell, Detective Guevara remarked to him "that all I had to do was come to the Station when they First came to my house, and identify the person he believed shot me, but, now I'm going to prison for the rest of my life." (*Id*. ¶ 3G (internal quotations omitted).)

The court does not agree that "no reasonable juror would have convicted [McDowell]" based on the affidavit. *See Smith*, 598 F.3d at 387-88. Nowhere in the statements described by McDowell does Guevara or Maher threaten to frame McDowell, nor do the detectives suggest that they rigged the procedure used to identify McDowell. (*See* McDowell Aff.) Maher's statement that "the witnesses used the photo [of McDowell in the black coat and green shirt] to identify [McDowell] in a photo and line-up array," seems to indicate only that McDowell's photo was shown to the witnesses as part of an array. (*Id*. ¶ 3E.) Maher does not indicate that the photo was shown to witnesses before the identification, or that witnesses saw the photo more than once. (*See id.*) Although Maher's statement that he "had nothing to do with the photographic

identification," and that "you didn't hear it from me" could be interpreted as an attempt to distance himself from the identification, there is nothing in any of Maher's other statements to indicate that the identification was unduly suggestive. (*See id.* ¶ 3F.) Guevara's comment that "all [McDowell] had to do was come to the Station . . . , and identify [his shooter], but, now [McDowell] going to prison for the rest of [his] life," sounds less like Guevara gloating about the alleged frame-up, and more like Guevara commenting on the irony of McDowell's predicament, having been brought to the station as a witness in one crime and identified as the suspect in another. (*Id.* ¶ 3G (internal quotations omitted).)

Moreover, certain details in McDowell's affidavit are contradicted by the testimony of witnesses at trial. McDowell claims that he went with the police voluntarily to look through gang profile books in search of his shooter. (*Id.* ¶ 3.) At trial, however, the arresting officer, James Gigler, testified that he was looking for McDowell in connection with the Castro shooting. (Tr. R. Vol. 2 at 93-95.) Gigler testified that McDowell did not go with the police voluntarily; rather, McDowell was arrested on suspicion of murder and brought the station house for questioning. (*Id.*) McDowell also suggests that Guevara decided to frame him after McDowell refused to identify his shooter at the station house. (McDowell Aff. ¶ 3.) But according to the testimony at trial, Medina identified McDowell as Castro's killer almost two weeks before the arrest; Varela and Morales-Santana identified Morales a day or two before McDowell was apprehended. (Tr. R. Vol. 1 at B63-66, 116-17, Tr. R. Vol. 2 at D33-34.) Based on these discrepancies, a reasonable juror could easily choose to reject McDowell's frame-up story.

Even assuming *arguendo* that Guevara had set up an unduly suggestive identification in an effort to frame McDowell, a rational juror could still conclude that McDowell murdered Castro based on the compelling eyewitness testimony presented at trial. *See Williams v. Benik*, 165 Fed. Appx. 487, 489-90 (7th Cir. 2006) (holding that unduly suggestive identification procedure did not create danger of misidentification where witness "clearly saw [defendant's] face from a distance of two to three feet"); *Abrams v. Barnett*, 121 F.3d 1036, 1041-42 (7th Cir. 1997) (holding that unduly suggestive identification procedure did not create danger of misidentification where witness "'had a clear view' of [the defendant] throughout the incident and . . . 'gave detailed attention to the individual who shot her brother'").[8]

Juan Medina, Castro's neighbor, testified that he heard a shot ring out and went to his enclosed second-story porch to investigate. (Tr. R. Vol. 1 at B49-50.) When Medina looked down into Castro's yard, he saw McDowell searching Castro's pockets as Castro lay face-down on the sidewalk. (*Id.*) Medina shouted down to McDowell, and McDowell "looked up" at Medina for "30 seconds or 15 seconds." (*Id.* at B50-51, 62.) Medina went back inside to tell his family what was happening; when he looked outside again, Medina saw Castro's nephew, Alberto Varela, fighting with McDowell. (*Id.* at B52-55.) Medina testified that he could easily see McDowell's face, and that he had an unobstructed view of McDowell for "at least two minutes" while McDowell traded blows with Varela in broad daylight. (*Id.* at B52-55, 62.)

---

[8] *See also Woods v. Johnson*, No. 07 C 0438, 2007 WL 4557101, at *7-8 (N.D. Ill. Dec. 21, 2007) (holding that "new evidence" from petitioner's family would not have resulted in acquittal in light of "compelling eyewitness testimony" adduced at trial); *United States ex rel. Weston v. Clark*, 101 F. Supp. 2d 685, 689-90 (N.D. Ill. 2000) (holding that post-trial recantation of witness testimony in murder case did not establish actual innocence where "numerous [other] witnesses" testified to petitioner's involvement in crime).

Varela testified that on the day of the murder he heard his aunt scream and looked out the window to investigate. (*Id.* at B103-08.) According to his testimony, Varela saw Castro lying on the sidewalk, and McDowell standing over the body rifling through Castro's pockets. (*Id.*) Varela ran outside to confront McDowell; when he did, McDowell picked a gun up from the ground and pointed it at Varela. (*Id.* at B108-09) Varela punched McDowell, but McDowell fired a shot at Varela and escaped into a nearby alley. (*Id.* at B110-12.) Varela testified that he "got pretty close to [McDowell] when [Varela] hit him," and was therefore able to see McDowell's face clearly. (*Id.*)

Morales-Santana testified that she was getting out of her parked car in an alley near Castro's home when McDowell approached her with a gun and threatened to kill her if she did not hand over her car keys and purse. (Tr. R. Vol. 2 at D15-20.) Morales-Santana complied, and watched McDowell drive off in her automobile. (*Id.* at D23.) McDowell was "very close" to Morales-Santana during the hijacking, maybe "two or three feet" in front of her, for approximately "four minutes." (*Id.* at D20-25.) As a result, Morales-Santana testified that she was able to get a good look at McDowell's face. (*Id.* at B25-26.)

Based on Medina, Varela, and Morales-Santana's testimony, a reasonable juror could conclude, even assuming that Guevara had used unduly suggestive identification procedures, that McDowell had not been misidentified as Castro's killer. All three witnesses had ample opportunity to observe McDowell up close; all three witnesses later identified McDowell in open court. (Tr. R. Vol. 1 at B50-51, B105-106; Tr. R. Vol. 2 at D17.) In light of the ambiguities in McDowell's affidavit, the inconsistencies between McDowell's affidavit and the testimony at trial, and Medina, Valera, and Morales-

14

Santana's eyewitness testimony, the court cannot conclude that no reasonable jury could have convicted McDowell.

### 2. Guevara's Alleged History of Misconduct

McDowell claims that "[a]t least 30 people have testified in court, depositions, or by affidavit to hav[ing] been intimidated or beaten by detective Guevara over the span of 19 years in order to obtain false identifications or unconstitutional confessions." (Second Amend. Pet. at 14.) The court does not agree with McDowell that a jury would have acquitted him based on these exhibits.

As a threshold matter, none of McDowell's thirty-plus exhibits relate to McDowell's case. (*See* McDowell Exs. 4-35.) Not a single one of the witnesses who testified against McDowell have recanted their testimony, and McDowell does not claim that Guevara attempted to coerce a confession out of him. (*See* Tr. R. Vols. 1 and 2.) Thus, McDowell's exhibits do not provide any direct support for his claims of innocence. *See Smith v. Uchtman*, No. 02 C 2631, 2005 WL 1766368, at * 3 (N.D. Ill. July 22, 2005) (holding that actual innocence not proven by "'thousands of pages of documents from the Chicago Police Department Office of Professional Standards' that show other complaints of excessive force lodged against the officers involved in this case").

Further, the accusations of misconduct levied against Guevara are wholly unsubstantiated. McDowell has failed to adduce any evidence Guevara was ever disciplined or found liable for misconduct, that testimony has been excluded or conviction overturned as the result of Guevara's alleged misconduct.[9] (*See* McDowell

---

[9] McDowell claims that a number of his exhibits substantiate the allegations levied against Guevara. Upon closer inspection, these exhibits are unavailing to McDowell. First, McDowell claims that Leshurn Hunt's confession was suppressed in Hunt's criminal trial as a result of Guevara's alleged misconduct, and that a "favorable jury verdict" was obtained in a civil lawsuit brought by Hunt. (Second Amend. Pet. at 15

15

Exs. 4-35.) This is significant because most if not all of the affidavits and testimony relied upon by McDowell come from various incarcerated gang members who claim that Guevara forced them to falsely confess to crimes or implicate other gang members. (*See id.*) A reasonably juror could easily determine that these witnesses are not credible, and completely disregard their accusations against Guevara. *See Araujo v. Chandler*, 435 F.3d 678, 681-82 (7th Cir. 2005) (holding that post-conviction affidavits of convicted felons recanting testimony implicating petitioner did not demonstrate actual innocence).

Finally, a rational juror could convict McDowell even assuming that a suggestive identification had occurred based on the testimony of Medina, Varela, and Morales-Santana at trial. *See Escamilla v. Walls*, No. 00 C 3270, 2004 WL 2339231, at *3 (N.D. Ill. Oct. 14, 2004) (holding that "evidence of a pattern of police abuse" does not prove actual innocence in the face of eyewitness testimony against petitioner). As set forth in section II.B.1. of this order, all three witnesses identified McDowell in court as the person who shot Castro and stole Morales-Santana's car. (*See* Tr. R. Vol. 1 at B50-51, B105-106; Tr. R. Vol. 2 at D17.) Because a rational jury would more likely than not still

---

(citing McDowell Ex. 4).) McDowell has failed to attach any exhibits to confirm this, and the Seventh Circuit's opinion in Hunt's civil lawsuit states that "the jury returned a verdict in favor of Hunt and against the defendants Weingart and the City of Chicago on the excessive detention claim while the remaining claims were resolved against Hunt and in favor of [Guevara and others]." (*See* McDowell Ex. 4 (citing *Hunt v. Jaglowski*, 926 F.2d 689, 690 (7th Cir. 1991) (affirming decision of trial court)).) Second, McDowell claims that Guevara told Wilfred Rosario that he would frame Rosario for murder if Rosario did not testify against the defendant in *People v. Arcos*. (Second Amend. Pet. at 17.) McDowell suggests that Arcos' conviction was overturned as a result of Guevara's threat, but that was not the case. (*See id.*) Instead, the Illinois Appellate Court reversed for lack of sufficient evidence, not because of any misconduct by Guevara. (*See People v. Arcos*, 668 N.E. 2d 1177, 1179-81 (Ill. App. Ct. 1996), McDowell Ex. 11.) Third, McDowell cites a report allegedly issued by the FBI, which contains allegations that Guevara had been accepting bribes in return for arranging positive or negative identifications of suspects in murder cases. (Second Amend. Pet. at 23.) It is hard to tell what this so-called FBI report means; McDowell does not provide any context for the report, nor do his attorneys attach an affidavit attesting to its authenticity. (*See id.*) It is also unclear from the report where those allegations came from or whether they were ultimately determined to be true. (*See* McDowell Ex. 35.)

convict McDowell despite the testimony and affidavits accusing Guevara of misconduct, McDowell has failed to demonstrate actual innocence.

### III. CONCLUSION

For the foregoing reasons, the court concludes that McDowell's Sixth and Fourteenth Amendment claims are not procedurally barred, to the extent those claims are based on the allegedly suggestive identification procedure described in McDowell's post-conviction briefing. (*See* Reply Br. and Argument for Pet.-Appellant at 5.)

Respondent requested an opportunity to address the merits of any claims not procedurally defaulted in subsequent briefing. (Answer to Second Amend. Pet. at 52.) Accordingly, Respondent is instructed to file a brief addressing the merits of McDowell's remaining claims within thirty (30) days of the entry of this order. McDowell may file a reply brief twenty-one (21) days thereafter.[10]

ENTER:  /s/
        JOAN B. GOTTSCHALL
        United States District Judge

DATED: August 6, 2010

---

[10] The court will rule upon McDowell's requests for an evidentiary hearing and discovery after briefing on the merits, if necessary. (Second Amend. Pet. at 37.)